JUDGE COTE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHERRY JACOBSON ASSOCIATES, INC., | Civil Action No. |
| Plaintiff, | **NOTICE OF REMOVAL** |
| | **(28 U.S.C. § 1441)** |
| v. | |
| ANDREW KATZ, | |
| Defendant. | |

**'08 CIV 7496 ·**

TO:    CLERK, UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK

    PLEASE TAKE NOTICE that Defendant Andrew Katz ("Defendant" or "Mr. Katz"), by and through his attorney Connell Foley LLP, hereby removes to this Court the state court action described below.

    1.    On or about July 31, 2008, Plaintiff Sherry Jacobson Associates, Inc. ("Plaintiff" or "SJA") filed an action against Mr. Katz in the Supreme Court of the State of New York, County of New York, captioned *Sherry Jacobson Associates Inc. v. Andrew Katz*, Index No. 650272/2008. A copy of the Summons and Verified Complaint with exhibits is attached as Exhibit A. A copy of Plaintiff's Notice of Discovery and Inspection to Defendant Andrew Katz is attached as Exhibit B. The Summons and Verified Complaint and Notice of Discovery and Inspection are the only papers in this action to date.

    2.    On August 4, 2008, Defendant Katz was personally served with the Summons and Complaint. Service was made at 220 East 42nd Street, New York, New York.

    3.    This Notice of Removal is timely filed because it is filed within thirty (30) days of the date of service of the Summons and Complaint. 28 U.S.C. § 1446(b).

1976335-02

4.    The Complaint seeks damages of not less than $6.5 million as well as equitable relief.

5.    The Court has original jurisdiction of this action under 28 U.S.C. Section 1332(a)(1). As set forth below, this action is removable pursuant to 28 U.S.C. Section 1441(a) because the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs, and the action is between citizens of different states.

5.    At the time this action was commenced and at the time of removal, plaintiff was a citizen of the State of York in that it is New York corporation with a principal place of business at 145 Central Park West, New York 10023.

7.    At the time this action was commenced and at the time of removal, Mr. Katz was a citizen of the State of New Jersey, residing at 7 Willard Court, Marlboro, New Jersey, 07748.

8.    For the reasons stated above, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  Accordingly, pursuant to 28 U.S.C. § 1441(a), this action is removable.

9.    Written notice of the filing of this Notice of Removal shall be given to Plaintiff, the only adverse party, by and through its designated counsel, as provided in 28 U.S.C. § 1446(d).

10.    By removing this action from state to federal court, Defendant does not waive any defenses that he may have to lack of personal jurisdiction, improper venue, insufficiency of process, insufficiency of service of process, or any other defense whatsoever.

WHEREFORE, Defendant Andrew Katz having established diversity of citizenship jurisdiction, respectfully requests that the above-captioned action now proceeding against him in the Supreme Court of the State of New York, County of New York, be removed from that forum and proceed in this Court as duly removed.

Dated: New York, New York
      August 25, 2008

CONNELL FOLEY LLP

By: _____
       Peter J. Pizzi
888 7th Avenue , Suite 3400
New York, New York 10106
ppizzi@connellfoley.com
Telephone: (212) 262-2390
Facsimile: (212) 262-0050

Attorneys for Defendant Andrew Katz

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHERRY JACOBSON ASSOCIATES, INC., | Civil Action No. |
| Plaintiff, | **CERTIFICATION OF SERVICE** |
| v. | |
| ANDREW KATZ, | |
| Defendant. | |

Peter J. Pizzi hereby certifies that a true copy of defendant's Notice of Removal was served by hand delivery on this 25th day of August, 2008, upon plaintiff's counsel at the following addresses:

> Laurie Berke-Weiss, Esq.
> BERKE-WEISS & PECHMAN LLP
> 488 Madison Avenue
> 11th Floor
> New York, New York 10022

> Craig A. Newman, Esq.
> Patricia C. O'Prey, Esq.
> RICHARDS KIBBE & ORBE LLP
> One World Financial Center
> New York, New York 10281

I further certify that on this same date I caused an original and two copies of defendant's Notice of the Filing of a Notice of Removal to be filed with the Clerk of the Supreme Court of the State of New York, New York County, 60 Centre Street, New York, New York 10007-1474.

Dated: New York, New York
August 25, 2008

_____
Peter J. Pizzi

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SHERRY JACOBSON ASSOCIATES INC.,                    :     Index No. 650272/2008

                       Plaintiff,         :

         -against-                                    :     **SUMMONS**

                              :     Index No. Purchased: July 31, 2008

ANDREW KATZ,                                         :     Plaintiff's New York County Address:

                Defendant.        :     145 Central Park West, #10B
                              :     New York, New York  10023

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TO THE ABOVE-NAMED DEFENDANT:

     YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorney within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York). In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiff has designated New York County as the venue based on CPLR § 503(c), in that plaintiff maintains a principle place of business in New York County.

Dated: New York, New York
July 31, 2008

BERKE-WEISS & PECHMAN LLP

By: _____
Laurie Berke-Weiss

488 Madison Avenue
11ᵗʰ Floor
New York, New York 10022
(212) 583-9500

-and-

RICHARDS KIBBE & ORBE LLP

By: _____
Craig A. Newman
Patricia C. O'Prey

One World Financial Center
New York, New York 10281
(212) 530-1800
*Attorneys for Plaintiff Sherry Jacobson Associates Inc.*

Defendant's Addresses:

Andrew Katz
7 Willard Court
Marlboro, New Jersey 07748

NY460125.1/156-00001

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------- x

SHERRY JACOBSON ASSOCIATES INC.,

                              Plaintiff,

      -against-

ANDREW KATZ,

                            Defendant.

------------------------------------------------------------- x

Index No. 650272/2008

**VERIFIED COMPLAINT**

Plaintiff Sherry Jacobson Associates Inc., also known as S.J.A. Inc. ("SJA"), by and through its attorneys Berke-Weiss & Pechman LLP and co-counsel Richards Kibbe & Orbe LLP, allege the following as their Complaint against Defendant Andrew Katz.

## SUMMARY OF THE ACTION

1.      This action arises from Defendant Andrew Katz's patient and well-orchestrated scheme to defraud SJA and unjustly enrich himself at SJA's expense. Defendant Katz's scheme unfolded on two fronts over the course of the past year. First, knowing that SJA was in the process of negotiating with Katz's employer, the Bernard Hodes Group Inc. ("Hodes"), for the purchase of SJA's business, Katz schemed to steal that business for himself, unjustly enriching himself and breaching his fiduciary duty to SJA in the process. Simultaneously, Katz was continuing a pattern of "literally" stealing from SJA by submitting fraudulent business expense account vouchers for purported "business" expenses related to client meetings and meals.

2.      As set forth below, Defendant's continuing actions constitute a course of conduct

of fraud, breach of fiduciary duty, unjust enrichment and tortious interference with contract. Based on this and other conduct that was clearly intended to deprive SJA of the fruits of its business, its clients and a career's-worth of business development, SJA is entitled to, among other things, compensatory damages, punitive damages, an accounting, the imposition of a constructive trust, a permanent injunction, attorneys' fees and costs.

## PARTIES

3.    Plaintiff S.J.A. Inc. is a New York corporation with an address at 145 Central Park West, New York, NY 10023.

4.    Defendant Andrew Katz is an individual residing at 7 Willard Court, Marlboro, New Jersey 07748, who is employed by Bernard Hodes Group Inc., and works at its offices located at 220 East 42nd Street, New York, New York 10017.

## JURISDICTION AND VENUE

5.    The Court has jurisdiction over the Defendant pursuant to CPLR § 301 as Defendant does business in New York State.

6.    Venue is proper in New York County pursuant to CPLR § 503 as at least one party resides in New York County.

7.    The damages sought in this action exceed the monetary threshold set forth in § 202.70 of the Rules of the Commercial Division of this Court.

## RELEVANT FACTS

8.    Defendant Andrew Katz worked in the Sherry Jacobson Group, or "SJ Unit," a separate operating center housed within Hodes, a large advertising and communications firm which is owned by Omnicom Group ("Omnicom"), a New York Stock Exchange-listed company. The SJ Unit is a business venture created by a certain Consulting Agreement, as

-2-

amended, by and between Bernard Hodes Advertising, Inc., a Delaware corporation, and S.J.A. Inc., a New York corporation (the "Consulting Agreement"). Sherry Jacobson is the principal of SJA. Defendant Katz, who is, on information and belief, thirty-seven years old, was hired approximately fifteen years ago for an entry-level position working for the SJ Unit. Mr. Katz worked his way up in the SJ Unit ranks, eventually becoming Ms. Jacobson's second-in-command, reporting directly to her and becoming her trusted advisor. As set forth below, Defendant Katz used his position as trusted advisor to SJA's detriment and to his own personal gain and benefit.

9.      SJA and Hodes established, and have operated under Ms. Jacobson's management, the highly successful and profitable SJ Unit within Hodes for the past 19 years. The SJ Unit engages in, among other things, certain marketing and communication functions that focus on the development and implementation of employer brand campaigns to recruit and retain top caliber talent for major corporations.

10.     On or about April 20, 1990, the SJ Unit was created pursuant to the Consulting Agreement. A copy of the Consulting Agreement is attached hereto as Exhibit 1 and deemed incorporated herein.[1] Under the Consulting Agreement, a "discrete operating profit center" was created within the Hodes organization known as the "SJ Unit."

11.     Pursuant to the Consulting Agreement, Hodes agreed to, among other things: (1) provide the office space, technology and back office services for the SJ Unit, and (2) account for the SJ Unit as a separate operating profit center with its own books and records.

---

[1] Ms. Jacobson, the principal of SJA, is referred to in the Consulting Agreement by her former name, Sherry Weiss. We refer to Ms. Jacobson by her current name herein. In addition, the signator to the Consulting Agreement, Bernard Hodes Advertising, Inc., has since changed its name to Bernard Hodes Group Inc.

12.     Among other things, the Consulting Agreement required the personal services of Ms. Jacobson who would function as the executive-in-charge and have primary responsibility and authority for the day-to-day operations of the SJ Unit. Ms. Jacobson agreed to run the SJ Unit and retain an ownership interest in the business of the SJ Unit, as well as share in its profits on a 50/50 basis with the Hodes organization. Specifically, Section 4 of the Consulting Agreement provides that "SJA shall be entitled to receive from [Hodes] compensation in an amount equal to 50% of the Unit Operating Profit for each calendar year during the Term (or applicable portion thereof if [SJA] provides services for only part of any calendar year) determined in accordance with clause (b) below (the "Unit Operating Profits")." Id.

## SJA Owns the Business of the SJ Unit

13.     The Consulting Agreement recognizes that clients of the SJ Unit – as opposed to clients of Hodes – belong to SJA and Ms. Jacobson. In order to accomplish this, the Consulting Agreement distinguishes between clients of Hodes and clients of Ms. Jacobson or the SJ Unit. Following termination, except in extremely limited circumstances that do not apply here, neither Ms. Jacobson nor SJA are restricted from soliciting or doing business with clients of the SJ Unit. Thus, SJA and Ms. Jacobson were – and are – free to take their clients with them following termination of the Consulting Agreement.

14.     With respect to clients of Hodes that are not clients of the SJ Unit, Section 9(a) of the Consulting Agreement sets forth SJA's obligations to Hodes. SJA agreed that, during the Term and for one year thereafter, SJA would not, directly or indirectly,

attempt in any manner to persuade any client of [Hodes] to cease to do business or reduce the amount of business which any such client has customarily done or contemplates doing with [Hodes]; or render any advertising, marketing or related services to or for any client or customer of [Hodes] unless such services are rendered as an employee or consultant of [Hodes]; whether or not the

-4-

relationships between [Hodes] and such client or customer was originally established in whole or in part through its/her efforts.

15.    The term "client" is defined restrictively in Section 9 of the Consulting Agreement such that the noncompete restrictions "shall not apply to any of the clients or accounts which are exclusively or primarily serviced or to be serviced by [the SJ Unit]." Importantly, this critical override to Ms. Jacobson's obligations not to compete for Hodes's clients makes plain that the non-compete obligations do not apply to any of SJA's own client relationships and all clients primarily serviced by the SJ Unit.

16.    Section 13 of the Consulting Agreement also expressly recognizes SJA's equity interest in the SJ Unit and the portability of SJA's clients.  Specifically, Section 13 provides that, in the event Ms. Jacobson retires, or at any time within one year following termination, if SJA or Ms. Jacobson

directly or indirectly elects to sell any interest which either may have retained in the clients, accounts or goodwill associated with the business of the SJ Unit, the Offering Party shall obtain an irrevocable and unconditional bona fide arm's length written offer for the purchase of the Business from a third party(ies) (hereinafter called the "Outside Party").  The Offering Party shall give a written notice (hereinafter called the "Option Notice") to [Hodes] setting forth such desire, which notice shall be accompanied by a photocopy of the original executed Bona Fide Offer and shall set forth the name and address of the Outside Party and the price and terms of such offer.  [Hodes] shall then have a first option to purchase the Business specified in the Option Notice at a price equal to the price proposed to be paid for the Business as specified in the Bona Fide Offer: said option to be exercisable by [Hodes] giving notice of such election to the Offering Party within thirty (30) days after the giving of the Option Notice.

17.    Thus, under the Consulting Agreement, SJA retains an ownership interest in the business of the SJ Unit.  Upon termination, SJA is free to "take" the SJ Unit business elsewhere and is not governed by noncompete provisions except in extremely limited circumstances not relevant here.  Consulting Agreement, § 9.  Indeed, Hodes bargained for and secured a right of

first refusal to purchase SJA's business under the Consulting Agreement in the event SJA decided to sell that business within one year following retirement or after termination of the Consulting Agreement.

### SJA and Hodes Negotiate the Sale of SJA's Business

18.    Beginning in the Spring of 2008, SJA and Ms. Jacobson began to negotiate with Hodes to sell SJA's interest in the SJ Unit. Over the next several months, in a series of meetings between representatives of Hodes, on the one hand, and Ms. Jacobson, on the other, the parties discussed and negotiated Hodes's proposed acquisition of the SJ Unit from Ms. Jacobson. During the course of these negotiations, Defendant Katz informed Ms. Jacobson that he was negotiating with a third party outside the Hodes organization for an equity interest in a start-up company that would provide the possibility for great opportunities long-term. Defendant Katz indicated that he did not want to continue in his present role, but would hope to move into a new role to advance his career. In the ongoing negotiations between SJA and Hodes, Joe Fortunato, the Chief Operating Officer and Chief Financial Officer of Hodes, indicated that while Hodes would prefer to retain Mr. Katz for Hodes's succession plan, doing so would not be a condition to the acquisition of the SJ Unit.

19.    Hodes and SJA began to negotiate the groundwork for an agreement on the sale price of the SJ Unit. At a meeting with Mr. Fortunato in May 2008, Mr. Fortunato and Hodes's Chief Executive Officer, Alan Schwartz, agreed that Ms. Jacobson should start recruiting and hiring for Mr. Katz's transition out of the SJ Unit.

20.    As part of their negotiations, Hodes developed a financial model and pro forma profit and loss statement to use in calculating the purchase price for SJA's business. The parties agreed to move forward with a purchase price calculated based on a three year forward-

looking revenue model. For instance, Hodes initially negotiated a deal to acquire the SJ Unit's business in an amount of 4 times the average annual SJ Unit profits over next three years if the SJ Unit grew at less than a 10% growth rate during the three year period; 5 times the average annual SJ Unit profits over the next three years if the SJ Unit grew at more than 10%; or 6 times the average annual SJ Unit profits if the SJ Unit grew at more than 15%. The deal was structured as a three-year payout with an initial lump-sum payment and subsequent payments based on profitability. While the parties continued to negotiate what would be included in the pro forma calculations, the last offer presented by Hodes to Ms. Jacobson set forth a fixed five-times multiple based on the SJ Unit's estimated operating profit for the preceding twelve months, ending in May 2008. Hodes estimated that amount to be between $1.3 to 1.4 million per year, which would result in a purchase price of $6.5 to $7 million.

21.    In the Summer of 2008, however, negotiations began to stall, on information and belief, by virtue of Defendant Katz's undermining, self-interested conduct. On information and belief, while Defendant Katz was telling Ms. Jacobson that he was pursuing other opportunities, he was conspiring with and inducing Hodes to breach its obligations under the Consulting Agreement with SJA and to deprive SJA of its right to the value of the SJ Unit business by mischaracterizing his role in the SJ Unit, as well as the status of the business. In particular, on information and belief, Defendant Katz induced Hodes to breach its Consulting Agreement by misleading Hodes that the SJ Unit's top twenty clients would leave the SJ Unit and follow Defendant Katz to Hodes in competition with the SJ Unit. On information and belief, these statements were false – in fact, none of the SJ Unit's clients have agreed to follow Defendant Katz to Hodes or to leave the SJ Unit. Indeed, SJA recently learned that Defendant Katz falsely told Hodes that, for example, one of the SJ Unit's clients had committed to a $1.2 million

contract. In fact, that client recently told Ms. Jacobson that Defendant Katz was advised over two months ago by that client that the client would not proceed with that contract and that the project was "dead."

22.    In addition, during the Summer of 2008, Ms. Jacobson began to become the target of offensive and insulting remarks by the leadership of Hodes, i.e., Chief Executive Officer Mr. Schwartz and Chief Financial Officer Mr. Fortunato, calculated to denigrate Ms. Jacobson and her role in the SJ Unit. In one instance, in a meeting with Messrs. Fortunato and Katz during the Summer of 2008, Mr. Fortunato told Ms. Jacobson that she was "out of touch," "behind the times with technology" and "incapable of handling clients." None of these statements had any merit and were intended instead to highlight Ms. Jacobson's age (59) relative to Defendant Katz's age (approximately 37). Indeed, it is clear in retrospect that Defendant Katz was ingratiating himself with Hodes management and falsely downplaying Ms. Jacobson's role in the SJ Unit and ability to retain the SJ Unit clients relative to his own, apparently, so he could steal (or "misappropriate") the value of SJA's interest in the SJ Unit business for himself.

23.    Having been influenced by Defendant Katz's false statements about his ability to retain the SJ Unit's clients and/or conspiring with Defendant Katz, in June 2008, Hodes made a 180 degree turn and insisted not only that Defendant Katz be included in the buyout of the SJ Unit, but that SJA provide him with a significant portion of the compensation it was to receive from Hodes to purchase the SJ Unit's business. Although the parties did not ultimately agree on a sale price for the SJ Unit's business, during their negotiations, Hodes insisted that Mr. Katz receive 40% of SJA's gain from the sale of the SJ Unit or it would not enter the transaction. Worse, Hodes threatened that if SJA did not agree to this deal, Hodes and Katz would take the SJ Unit's top twenty clients to Hodes and compete directly with SJA.

-8-

24.     Ms. Jacobson informed Hodes management that she had major concerns about Mr. Katz's honesty and integrity based on recent events and was not going to entrust SJA's clients to such an individual. At a meeting on Thursday, July 10, 2008, in the office of Hodes's President & CEO, Mr. Schwartz, Ms. Jacobson and her counsel expressed concerns that, upon information and belief, certain of Defendant Katz's expense account submissions and behavior on client trips raised "red flags" (in addition to other inappropriate conduct including Defendant Katz's transmission of pornography via the Internet and the SJ Unit computer system (including to Hodes's CFO, Mr. Fortunato) and excessive drinking while on SJ Unit business) which needed to be thoroughly and properly investigated, and inquired how Hodes intended to proceed to investigate these allegations. Ms. Jacobson's counsel indicated asked whether Defendant Katz be suspended during this period of investigation. Messrs. Fortunato and Schwartz declined to state what course of action or investigation they would conduct. Mr. David Lehv, counsel for Hodes, also declined to provide any detail. Ms. Jacobson's counsel said that such was not a satisfactory response. In response, Mr. Schwartz became enraged, threw a book and then screamed at Ms. Jacobson and her counsel to "get the f*** out of my office – both of you, get the f*** out of my office."

### Defendant Katz Induced Hodes to Breach the Consulting Agreement

25.     On July 11, 2008, less than 24 hours after that meeting, Mr. Fortunato entered Ms. Jacobson's office and informed her that she was to be escorted out of the SJ Unit's offices. Simultaneously, Ms. Jacobson was provided with a letter on Hodes letterhead, signed by Mr. Fortunato, and styled as a notice of termination. The letter purported to provide "notice of [Hodes's] intention to terminate the S.J.A. Consulting Agreement and your services effective January 7, 2009." Termination Notice dated July 11, 2008, attached hereto as Exhibit 2 (the

"Termination Notice"). The Termination Notice indicated that pursuant to the Consulting Agreement, Hodes intended to terminate the Consulting Agreement in 180 days but provided that, until the actual termination date, January 7, 2009, Ms. Jacobson was instructed "not to come into the office or to conduct Unit Business until further notice." Id. On information and belief and based on his actions toward and comments about Ms. Jacobson, Defendant Katz induced Hodes to breach the Consulting Agreement with SJA and held himself out as Ms. Jacobson's successor to the SJ Unit business.[2]

26.     The Termination Notice purported to provide Ms. Jacobson only with notice of its intent to terminate the Consulting Agreement; Hodes was not terminating the Consulting Agreement at that time. Simultaneously, however, Hodes was preventing Ms. Jacobson and SJA from exercising their rights (including the right to office space, support staff, back office services and technology) and performing their obligations and duties under the Consulting Agreement. Notably, by being prevented from performing their duties under the Consulting Agreement, Ms. Jacobson and SJA were also prevented from meeting urgent and substantial ongoing commitments to sustain and develop the business that had made the SJ Unit profitable for many years.

27.     Moreover, at the same time Hodes was telling Ms. Jacobson that SJA was not yet terminated and that Hodes was only providing SJA with notice of its "intent" to terminate the Agreement effective January 2009, Ms. Jacobson has been advised that Defendant Katz is telling the SJ Unit's clients that Hodes and Ms. Jacobson had "parted ways" "as of Friday afternoon" and that Mr. Katz was now "in charge" of the SJ Unit. On information and belief, these

---

[2] SJA and Ms. Jacobson are separately pursuing their rights and remedies against Hodes based upon Hodes's breach of the Consulting Agreement in an arbitration proceeding.

-10-

statements point to Katz's role in effecting delivery of the Termination Notice. Defendant Katz and Hodes's intent in providing Ms. Jacobson with the 180 day Termination Notice and preventing Ms. Jacobson from performing under the Consulting Agreement, rather than terminating Ms. Jacobson and SJA outright, was made clear in the third paragraph of the Termination Notice. In that paragraph, Hodes warned Ms. Jacobson as follows:

> We take this occasion to remind you that until the effective date of the termination of your consultancy, you remain an executive of the Company. We will expect you to abide by all restrictions and covenants imposed upon you under the Consulting Agreement or by reason of your position, including those prohibiting attempts to hire Company employees, the solicitation and /or servicing of its clients, and any other activity having the foreseeable effect of injuring this Company's reputation, business or business relationships.

28.     Thus, although the Consulting Agreement provided that Ms. Jacobson and SJA would be able to keep their clients following termination of the Consulting Agreement – and even provided that Hodes would be required to pay Ms. Jacobson and/or SJA for the right to purchase the value of that business pursuant to Hodes's right of first refusal should Ms. Jacobson choose to sell her business within one year of the termination of the Agreement – by preventing Ms. Jacobson and SJA from performing their duties under the Consulting Agreement and by breaching the Agreement itself by refusing to provide office space, back office and other services, upon information and belief, Hodes and Katz were attempting to circumvent Hodes's obligation to pay SJA for the value of its business and to preclude SJA from soliciting or doing any business with those clients during the 180 day notice period. As such, Hodes and Katz apparently seek to use Hodes's very breach of the Agreement, and Hodes's and Katz's breach of their duties and attempt to usurp opportunities from SJA, to their advantage. Similarly, Defendant Katz sought to take advantage of the situation in which, on information and belief, he was a participant, by soliciting SJA's clients and telling them that SJA and Ms. Jacobson had

-11-

separated by mutual agreement and that Mr. Katz was assuming Ms. Jacobson's role.

29.     On information and belief, Hodes's intent in providing the 180 day Termination Notice and preventing SJA from performing under the Consulting Agreement, rather than terminating SJA outright, was to seize control of the SJ Unit from SJA without having to purchase the business from SJA as set forth in the Consulting Agreement. On information and belief, Defendant Katz's intent in inducing Hodes to send the Termination Notice was to acquire SJA's clients, and SJA's profits earned from those clients, for his own benefit.

## Ms. Jacobson and SJA Discover Defendant Katz's Fraudulent Submission of Expense Reports

30.     In June 2008, Ms. Jacobson became suspicious with respect to Mr. Katz's travel and expense submissions when he returned from a purported client-trip to Sioux Falls, South Dakota taken early that month. Based on information learned both from Mr. Katz himself and other sources, Ms. Jacobson discovered that during the trip Mr. Katz hosted a multiple-hour event in a local bar which involved heavy drinking and certain highly inappropriate sexual behavior in the bar's restroom. Mr. Katz's irresponsible behavior on the Sioux Falls trip provided a "red flag" to Ms. Jacobson, causing her to review the documentation that Mr. Katz had submitted (and self-approved) for reimbursement of the business expenses incurred on the trip. The documentation confirmed that an excessive volume of alcohol was consumed over the course of many hours in one evening. Mr. Katz's requests for reimbursement relating to the Sioux Falls trip also included repeated references to, and alleged documentation for, client site visits that, by Mr. Katz's own subsequent admission, did not occur even though such visits were the purpose of the trip Mr. Katz had stated to Ms. Jacobson before leaving for Sioux Falls.

31.     As a result, Ms. Jacobson undertook a review of certain of Mr. Katz's expense

account submissions, all of which were paid for, in part, by SJA. When Ms. Jacobson noticed several entries that appeared suspicious, she began making inquiries related to submissions for expenses related to certain "client" meetings, lunches, dinners and travel expenses. Indeed, Ms. Jacobson has since become aware that Mr. Katz submitted expense reports relating to meetings, lunch and dinner events that did <u>not</u> actually occur. In one instance, Mr. Katz allegedly had lunch with an individual at PricewaterhouseCoopers. Ms. Jacobson has since confirmed that the client referenced on Mr. Katz's expense report that she did not have lunch with Mr. Katz. Similarly, Mr. Katz submitted an expense report for a lunch with a client at Memorial Sloan-Kettering Hospital after the individual with whom he purportedly had lunch had already retired from that hospital. Indeed, the client herself has since confirmed to Ms. Jacobson that she did not eat with Mr. Katz on that occasion. In addition, Mr. Katz submitted expense reports for two dinner events with a "client" from Meridian Health at a location near Mr. Katz's home. That client has since confirmed to Ms. Jacobson that he did not dine with Mr. Katz and, in fact, was away on vacation during one of the alleged dinner meetings. On other occasions, Mr. Katz submitted expense reports describing as the justification for the lunch or travel expense possible business opportunities that Ms. Jacobson knows did not exist and which opportunities would have been known to Ms. Jacobson if they did exist. For example, Mr. Katz submitted expenses related to accounts on which he did not perform any services. Significantly, such charges were paid for, in part, by Ms. Jacobson and SJA under Mr. Katz's employment agreement. Thus, by submitting such expenses, Mr. Katz was effectively stealing from SJA and Ms. Jacobson.

-13-

### Defendant Katz's Business Expenses Reduce Profits Payable to the SJ Unit

32.    Section 4(b)(i) of the Consulting Agreement defines Unit Operating Profits as "Unit Operating Revenues less Unit Operating Expenses." Exhibit A of the Consulting Agreement defines Unit Operating Revenues as, for all relevant intents and purposes, "all billings to clients of the [SJ] Unit," less certain taxes, discounts or credits provided to clients. Exhibit B of the Consulting Agreement provides a definition of Unit Operating Expenses which, for all relevant intents and purposes, is defined as the costs and expenses in operating the SJ Unit including, for example, costs paid for media placement, production materials, compensation for Ms. Jacobson and individuals who report to her, such as Defendant Katz, and the "ordinary, necessary and reasonable business-related travel and entertainment expenses of [employees] of the [SJ] Unit . . . . " *Id.* Accordingly, Section 4(b)(i) of the Consulting Agreement makes clear that "business-related travel and entertainment expenses" incurred by employees assigned to the SJ Unit, such as Defendant Katz, are included in the definition of Unit Operating Expenses to be born, in part, by SJA.

33.    The full financial impact of Mr. Katz's actions, and the extent of Mr. Katz's actions, are not known at this time to SJA. By way of the relief sought herein, SJA seeks to conduct an accounting of Mr. Katz's expense reimbursement forms to ascertain the precise financial impact of his actions.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Fraud)

34.    SJA incorporates Paragraphs 1 through 33 of the Complaint as if fully stated herein.

35.    The acts, misrepresentations and intentional material omissions made by Defendant Katz with respect to his SJA expense reimbursement requests constitute common law fraud.

36.    As a direct and proximate result of the foregoing, SJA has been injured in an amount to be determined at trial, but in an amount not less than $6.5 million.

37.    In engaging in said acts, defendant acted willingfully, and with oppression, fraud, and malice;  SJA is therefore also entitled to punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty)

38.    SJA incorporates Paragraphs 1 through 37 of the Complaint as if fully stated herein.

39.    In undertaking his role within the SJ Unit, Defendant Katz had a fiduciary duty of loyalty and good faith to SJA in all acts undertaken on behalf of, and with respect to, the SJ Unit.

40.    As such, Defendant Katz had a obligation to refrain from misrepresenting facts and information and/or failing to disclose facts that would constitute a fraud upon the SJ Unit and SJA, to refrain from converting, misappropriating, or looting SJ Unit property and assets, and to refrain from otherwise acting in ways that violated his fiduciary duties.

41.    In addition, Defendant Katz had an obligation to refrain from usurping SJA clients and corporate opportunities for his own benefit.  Defendant Katz is currently inducing SJ

-15-

Unit clients to cease doing business for SJA and Ms. Jacobson in violation of his fiduciary duties.

42. Moreover, by submitting expense account vouchers and receipts based on false information, Defendant Katz breached his fiduciary duties to SJA.

43. As a direct and proximate result of the foregoing, SJA has been injured in an amount to be determined at trial, but in an amount not less than $6.5 million.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Unjust Enrichment)

44. SJA incorporates Paragraphs 1 through 43 of the Complaint as if fully stated herein.

45. As described in this Complaint, Defendant Katz has committed a series of wrongful and fraudulent acts against the SJ Unit and SJA for his own benefit. As a consequence of said acts, on information and belief, Defendant Katz was able to obtain property, money and SJ Unit clients and business at the expense of the SJ Unit and SJA. Defendant Katz's benefits received by virtue of the foregoing conduct would, if permitted, enrich him under such circumstances as shock the conscience and mandate the return of such property, money and other benefits received.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Usurpation of Corporate Opportunities)

46. SJA incorporates Paragraphs 1 through 45 of the Complaint as if fully stated herein.

47. In undertaking his role within the SJ Unit, Defendant Katz had a fiduciary duty of loyalty and good faith in all acts undertaken on behalf of, and with respect to, the SJ Unit.

-16-

48.    As such, Defendant Katz had an obligation to refrain from misrepresenting facts and information and/or failing to disclose facts that would constitute a fraud upon the SJ Unit and SJA, to refrain from converting, misappropriating, or looting SJ Unit property and assets, and to refrain from otherwise acting in ways that violated his fiduciary duties.

49.    In addition, Defendant Katz had an obligation to refrain from usurping SJA clients and corporate opportunities for his own benefit.  Defendant Katz is currently inducing SJ Unit clients to cease doing business for SJA and Ms. Jacobson in violation of his fiduciary duties.

50.    As a direct and proximate result of the foregoing, SJA has been injured in an amount to be determined at trial, but in an amount not less than $6.5 million.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Tortious Interference With Contract)

51.    SJA incorporates Paragraphs 1 through 50 of the Complaint as if fully stated herein.

52.    Defendant Katz was aware of the Consulting Agreement and its terms.  Defendant Katz intentionally, willingfully and with malice interfered with SJA's rights under the Consulting Agreement by, among other things, participating in the aforementioned expense account fraud and inducing Hodes to breach its obligations under the Consulting Agreement.

53.    Said acts were wrongful, without lawful cause, and undertaken by Defendant Katz solely to harm SJA and to wrongfully enrich himself.

54.    The foregoing constitutes tortious interference with contract under the common law.

55.    As a direct and proximate result of the foregoing, SJA has been injured in an

amount to be determined at trial, but in an amount not less than $6.5 million.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Claim for an Accounting)

56.    SJA incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

57.    Under Section 4 of the Consulting Agreement, SJA was to receive 50% of all Unit Operating Profits generated by the SJA Unit each year.  Under Section 6(b) of the Consulting Agreement, said monies were to be paid to SJA on an interim and yearly basis.

58.    Upon information and belief, Defendant Katz may now owe SJA monies under Section 4 of the Consulting Agreement, and/or Defendant Katz may now be holding SJA's share of such monies.

59.    By virtue of the foregoing, SJA seeks, and is entitled to, an accounting of the monies owed to it under Section 4 of the Consulting Agreement  and, upon said accounting, a judicial declaration directing the payment to SJA of any monies so owed.

60.    As a direct and proximate result of the foregoing, SJA has been injured in an amount to be determined at trial, but in an amount not less than $6.5 million.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (Claim for Imposition of a Constructive Trust)

61.    SJA incorporates Paragraphs 1 through 60 of the Complaint as if fully stated herein.

62.    Defendant Katz is currently in possession of assets, monies and/or business belonging to SJA.

63.    Such possession is in diminution of SJA's superior right, title and interests in said

-18-

assets, monies and/or business.

64.    Defendant Katz came into possession of such assets, monies and/or business through acts of fraud, deceit and breach of fiduciary duty. Defendant Katz's continued possession of these assets, monies and/or business is wrongful.

65.    In view of the foregoing, SJA is entitled to imposition of a constructive trust over all such assets, monies, or business wrongfully held by Defendant Katz, together with any profits or interest earned by Defendant Katz while in wrongful possession of these assets, monies and/or business.

## AS AND FOR A EIGHTH CAUSE OF ACTION

### (Claim for Permanent Injunctive Relief)

66.    SJA incorporates Paragraphs 1 through 65 of the Complaint as if fully stated herein.

67.    As set forth more fully above, Defendant Katz has engaged in breaches of fiduciary duties to and theft of corporate opportunities from SJA.

68.    SJA has already suffered, and will continue to suffer, irreparable damage caused by Defendant Katz's continued breach of fiduciary duty and theft of corporate opportunities from SJA.

69.    Accordingly, SJA seeks additional relief in the form of a permanent injunction enjoining Defendant Katz from further breaching his fiduciary duties and/or engaging in theft of corporate opportunities from SJA.

-19-

**WHEREFORE,** Plaintiff SJA demands (a) judgment against Defendant in an amount to be determined at trial but presently believed to be not less than $6.5 million, together with interest and costs and attorneys' fees associated with this action, (b) an accounting and the imposition of a constructive trust, and (c) such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        July 31, 2008

BERKE-WEISS & PECHMAN LLP

By: _____
    Laurie Berke-Weiss
    488 Madison Avenue, 11th Floor
    New York, New York 10022
    (212) 583-9500


RICHARDS KIBBE & ORBE LLP

By: _____
    Craig A. Newman
    Patricia C. O'Prey
    One World Financial Center
    New York, New York 10281
    (212) 530-1800

Attorneys for Plaintiff Sherry Jacobson Associates Inc.

# VERIFICATION

STATE OF NEW YORK )
) ss.:
COUNTY OF SUFFOLK )

SHERRY JACOBSON, being duly sworn, deposes and says:

1.    I am the principal of Sherry Jacobson Associates Inc., plaintiff in the action herein.  I have read the annexed Verified Complaint, know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.

_____
Sherry Jacobson

Sworn and subscribed to before me this
31st day of July 2008—

_____
Notary Public

DAVID J MCHUGH
Notary Public, State of New York
No. 01MC5128372
Qualified in Suffolk County
Commission Expires June 13, 2009

NY461738.1/156-00001

Exhibit 1

# CONSULTING AGREEMENT

**AGREEMENT**, made this 20th day of April, 1990, by and between **BERNARD HODES ADVERTISING, INC.**, a Delaware corporation, having its principal office at 555 Madison Avenue, New York, New York 10022 (hereinafter the "Company") and **S.J.A. INC.**, a New York corporation, having its principal office at 145 Central Park West, New York 10023 (hereinafter "SJA").

# W I T N E S S E T H :

WHEREAS, the Company is engaged in the business of producing and placing recruitment, classified and other advertising, principally in newspapers and magazines of general circulation, on behalf of its clients;

WHEREAS, the Company is a wholly-owned subsidiary of Omnicom Group Inc. (the "Parent");

WHEREAS, the Company maintains offices for the transaction of its business, among other places, at 555 Madison Avenue, New York, New York and wishes to establish, within such offices, a discrete operating profit center to be known as the "Second Floor Unit" (the "Unit");

WHEREAS, the Company has offered to provide Sherry Weiss ("Weiss") with office space, telecommunications, and other services customarily regarded as "back office" services employed in the recruitment advertising business;

WHEREAS, the Company wishes to engage from SJA the services of Weiss to manage the Unit and SJA is desirous of providing, and has the right to provide, the services of Weiss, on the terms and conditions contained herein,

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the parties hereto agree as follows:

1.    **Office.**
        The Company hereby engages SJA to provide the personal services of Weiss to serve as a Senior Vice President of the Company for the Term specified in paragraph 2, and SJA hereby agrees to provide Weiss' services to the Company upon the terms and conditions hereinafter set forth.

2.    **Term.**
        This Agreement shall commence on or about May 15, 1990 and continue thereafter until terminated by either of the parties on not less than 180 days' prior written notice to the other (which may be given no sooner than 180 days from the date

of this Agreement), unless sooner terminated under the provisions hereof (hereinafter, the "Term").

3.   **Duties and Responsibilities.**
(a)    During the Term, SJA will provide the personal services of Weiss who will serve as an executive of the Company, having the title Senior Vice President and, in such capacity, shall have primary responsibility and authority for the day to day operations of the Unit, subject to the authority of the President and Board of Directors of the Company. Weiss' services to the Company will be full-time and exclusive, and during the Term, Weiss agrees that she will devote all of her business time and attention and her best efforts, skill and ability to promote the Company's interest; to work in a competent and ~~professional~~ manner; to generally promote the interests of the clients of the Company and the Unit; and to perform such duties and responsibilities commensurate with her position as may be assigned to her from time to time by or under the authority of the President or the Board of Directors of the Company, including making recommendations as to the classification, hiring and compensation of Unit personnel and the general operations of the Unit. Subject to the foregoing, Weiss may devote a reasonable portion of her time to non-profit public service activities, including civic, political and religious matters, as well as personal business matters not prohibited by paragraph 9.

(b)    Weiss' services under this Agreement will be performed primarily at the Company's offices in or about New York City. The parties acknowledge and agree, however, that the nature of Weiss' duties hereunder may require domestic and possibly international travel from time to time.

4.   **Compensation.**
(a)    In full consideration for the services to be provided to the Company by Weiss hereunder, SJA shall be entitled to receive from the Company compensation in an amount equal to 50% of the Unit Operating Profits for each calendar year during the Term (or applicable portion thereof if Weiss provides services hereunder for only part of any calendar year) determined in accordance with clause (b) below (the "Unit Operating Profits").

(b)    For purposes of this Agreement, the following terms shall have the following meanings:

(i)    "Unit Operating Profits" shall mean "Unit Gross Revenues" less "Unit Operating Expenses";

(ii)    "Unit Gross Revenues" shall have the meaning stated in Exhibit A; and

(iii)    "Unit Operating Expenses" shall having the meaning stated in Exhibit B.

-2-

Unit Operating Profits shall be calculated in accordance with generally accepted accounting principles, as in effect from time to time consistently applied ("GAAP"), except as otherwise specified in this Agreement.

(c)    Throughout the Term, and subject to the provisions of Paragraph 8 hereof, SJA will be entitled to draw against the amount of its compensation as calculated in accordance with clauses (a) and (b) above, at the rate of $50,000 per month (payable in semi-monthly installments of $25,000 in accordance with the Company's regular payroll practices), subject to adjustment as follows:    at the end of each consecutive three (3) month period during each calendar year of the Term, the chief financial officer of the Company shall calculate, in accordance with paragraph 4(b) and in conformity with the Company's financial statements, the Unit Operating Profits earned from the commencement of such calendar year through the close of such three (3) month period and compare the same to SJA's draw to date.  In the event that, as of the close of any such three (3) month period, the aggregate drawings taken by SJA shall exceed 50% of Unit Operating Profits during the same period, SJA's draw shall be adjusted to an amount which, in the discretion of the chief financial officer, will enable the Company to re-coup any such excess drawings and to make future drawings correspond to estimated Unit Operating Profits over the remainder of such year.

(d)    SJA may audit at its own expense the books and records of the Company in which confirmation pertaining to the calculation of Unit Operating Profits is recorded, and the Company's records supporting its entries in those books, provided that such audits shall be performed not more than once per year, during reasonable business hours and at the place where those books and records are normally kept.  If any audit discloses an underpayment, and the Company is in agreement with the result of the audit, the Company shall promptly pay to SJA the additional amount due, and if the underpayment is five (5%) percent or more, the Company shall reimburse SJA for the expense of the audit.

(e)    A statement of SJA's compensation pursuant to clause (a) above, shall be furnished to SJA within thirty (30) days following the issuance of the Company's financial statements for each calendar year during the Term.  Such statement shall also reflect SJA's aggregate drawings against such compensation during such calendar year. The amount due to SJA, net of applicable drawings, shall be paid in full on or before the earlier of (i) thirty (30) days following the issuance of the Company's financial statements, or (ii) one hundred five (105) days after the end of each calendar year, subject to the following condition:

an amount equal to (A) 35% of the unpaid accounts receivable from such calendar year, at any time during the Term, or (B) 50% of the unpaid accounts receivable from such calendar year, at any time after the end of the Term, shall be reserved from any payments made to SJA until such receivables are collected (to be paid over on a monthly basis as such receivables are collected).

-3-

In the event that the aggregate of SJA's drawings for any year shall have exceeded the total additional compensation payable to SJA for such year, the Company shall offset such excess against any compensation thereafter payable under this Agreement. At the end of the Term, SJA shall promptly repay any such outstanding excess amount remaining after taking into account all outstanding amounts to be paid to SJA in the future under the terms of this Agreement.

5.    **Expenses.**

In addition to the compensation provided for under paragraph 4, the Company agrees to pay or to promptly reimburse SJA during the Term for all reasonable, ordinary and necessary vouchered business or entertainment expenses incurred by it in connection with the performance by Weiss of her services hereunder in accordance with Company policy as from time to time in effect, provided however that the aggregate amount of reimbursable travel and entertainment expenses for Weiss and all other personnel employed by the Unit shall not exceed $36,000 in any year during the Term.

6.    **Office Space and Facilities to be Provided by the Company.**
(a)    Throughout the Term, the Company will provide for the Unit, office space, facilities and equipment as shall be reasonably required for the conduct of its business as more fully set forth on Exhibit C to this Agreement.

(b)    The Company will account for the Unit's operations as though the Unit were a discrete operating entity and will maintain books and records with respect to the same, open at all reasonable business times for inspection by SJA or its representatives.

(c)    It is anticipated that, initially, the Unit will employ full time and part-time staff members whose time and efforts will be devoted primarily to the operations of the Unit and that the aggregate related salary, fringe benefits and tax cost for said staff is anticipated to equal or exceed $617,100 for the first twelve (12) months of the Term. Subject to the mutual agreement of the Company, Weiss shall have discretion in the selection of Unit staff and determination of all issues relating to compensation, including raises, bonuses and similar salary or benefit adjustments.

7.    **Termination of Services.**
(a)    _Voluntary Termination._ Both the Company and SJA may terminate the Term and engagement of Weiss' services to the Company hereunder at any time (a "Voluntary Termination") upon giving the other party at least six (6) months' prior written notice of the termination.

(b)    _Involuntary Termination._ The Company may terminate the Term and engagement of Weiss' services hereunder at any time (an "Involuntary Termination") immediately upon giving SJA notice of the termination if Weiss is incapacitated or disabled by accident, sickness or otherwise so as to render Weiss mentally or physically

-4-

incapable of performing the services required to be performed by Weiss under this Agreement for a period of ninety (90) days whether or not consecutive during any period of one hundred and twenty (120) consecutive days.   Until the Company shall have terminated the Term and engagement of Weiss' services under this paragraph 7(b) SJA shall be entitled to receive its full compensation notwithstanding Weiss' physical or mental disability.   If Weiss dies during the term of this Agreement, there shall be deemed to be an Involuntary Termination as of the date of Weiss' death. Notwithstanding an Involuntary Termination, SJA shall continue to receive an amount equal to 3% of Unit Gross Revenues until the fourth anniversary of such Involuntary Termination, to be paid (subject to all hold-backs and conditions on such payment contained in this Agreement) in monthly or other regular periodic installments as the Company shall elect.

(c)  Termination for Cause.  The Company may terminate the Term and engagement of Weiss' services at any time for cause (a "Termination for Cause") immediately upon giving SJA notice of the termination.   For the purposes of this Agreement, "cause" shall include the following:

(i)   SJA or Weiss' repeated or continuing failure or refusal to perform its/her duties and responsibilities as set forth in paragraph 3 hereof;

(ii)   dishonesty of SJA or Weiss affecting the Company;

(iii)   conviction of SJA or Weiss of a felony or of any crime involving moral turpitude, fraud or misrepresentation;

(iv)   any willful and intentional act of SJA or Weiss having the effect of materially injuring the reputation, business or business relationships of the Company;; and

(v)  any material breach by SJA or Weiss not covered by any of the clauses (i) through (iv) of any of the provisions of this Agreement.

(d)   Payment of Earned but Unpaid Compensation.   Upon termination of Weiss' services hereunder for any reason, the Company shall pay to SJA the earned but unpaid portion of compensation calculated pursuant to paragraph 4(a) (subject to all hold-backs and conditions on such payment contained in this Agreement).

8.   **Unit Operating Profit Targets.**

(a)   During the first full calendar month of the Term, it is expected that the Unit will attain Unit Operating Profits (without deduction for SJA's monthly draw pursuant to paragraph 4(c) hereof) of not less than $75,000.

(b)     Thereafter, as of the end of every calendar month during the Term, the average monthly Unit Operating Profits of the Unit on a year-to-date basis is expected to equal or exceed $75,000.

(c)     In the event that either of the targets specified in clauses (a) and (b) above are not met at any time during the Term, then notwithstanding any provisions to the contrary contained in this Agreement, the Company may, in its discretion, take one or more of the following actions:

(i)     immediately reduce the monthly draw payable to SJA pursuant to paragraph 4(c);

(ii)     commence good faith negotiations with SJA to revise the compensation scheme set forth in this Agreement; and

(iii)     terminate the Term and engagement of Weiss' services hereunder upon giving SJA 60 days' prior written notice of such termination.

9.     <u>Non-Competition and Protection of Confidential Information</u>.
(a)     SJA and Weiss agree that Weiss' services hereunder are of a special, unique, extraordinary and intellectual character and that her position with the Company places her in a position of confidence and trust with the clients and employees of the Company. Accordingly, each of SJA and Weiss agree that during the Term and for a period of one (1) year after the termination of the Term and the engagement of Weiss' services pursuant to paragraph 8(c)(iii) (only) hereof, neither SJA nor Weiss will, directly or indirectly:

(i)     attempt in any manner to persuade any client of the Company to cease to do business or to reduce the amount of business which any such client has customarily done or contemplates doing with the Company;

(ii)     render any advertising, marketing or related services to or for any client or customer of the Company unless such services are rendered as an employee or consultant of the Company; whether or not the relationship between the Company and such client or customer was originally established in whole or in part through its/her efforts,

(iii)     employ or attempt to employ or assist anyone else to employ any person who is then or at any time during the preceding year was in the Company's employ excluding employees of the Unit.

(b)    The Company agrees that for a period of one (1) year after the termination of the Term and engagement of Weiss pursuant to paragraph 8(c)(iii) hereof (only), it will not directly or indirectly:

(i)    attempt in any manner to persuade any client of SJA or Weiss which was a client of the Unit during the Term to cease to do business or to reduce the amount of business which any such client has customarily done or contemplates doing with SJA or Weiss;

(ii)    render any advertising, marketing or related services to or for any client or customer of SJA or Weiss which was a client of the Unit during the Term unless such services are rendered on behalf of SJA or Weiss.

(iii)    employ or attempt to employ or assist anyone else to employ any person who is  in the employ of SJA or Weiss.

As used throughout this paragraph 9, the term "Company" shall mean the Company, and any affiliated and subsidiary corporations of the Company and the term "client" shall mean (A) anyone who is then a client of the Company or of SJA or Weiss, as the case may be; (B) anyone who was a client at any time during the six-month period immediately preceding the date of termination of the Term and engagement of Weiss' services hereunder; and (C) any prospective clients to whom the Company or the Unit had made a presentation (or similar offering of services) within a period of 90 days immediately preceding the date of such termination of the Term and the engagement of Weiss' services hereunder but, notwithstanding the foregoing clauses (A), (B) and (C), it is understood and agreed that with respect to the covenants of SJA and Weiss, the term "client" will not be deemed to include, and the restrictions contained in (a)(i) and (ii) above shall not apply to any of the clients or accounts which are exclusively or primarily serviced or to be serviced by the Unit.

(c)    The Company, on the one hand, and SJA and Weiss, on the other, agree that it or she will not at any time (whether during the Term or after termination of this Agreement), disclose to anyone any confidential information or trade secret of the other or any client of the other, or utilize such confidential information or trade secret for its or her own benefit, or for the benefit of third parties.  The term "confidential information or trade secret of the other or any client of the other" does not include any information which becomes generally available to the public other than by breach of this provision.

(d)    All employees of the Unit shall sign confidentiality agreements with the Company and SJA to further implement the provisions of this paragraph 9.

(e)    If either of SJA and Weiss on the one hand,  or the Company, on the other, commits a breach or threatens to commit a breach, of any of the provisions of (a) or (b) above, the non-breaching party shall have the right to have the provisions of this

-7-

Agreement specifically enforced by any court having equity jurisdiction without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law. In addition, the non-breaching party may take all such other actions and remedies available to it under law or in equity and shall be entitled to such damages as it can show it has sustained by reason of such breach.

(f)    If any of the covenants contained in (a) or (b), or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or areas of such provision and, in its reduced form, said provision shall then be enforceable.

(g)    In the event that any action, suit or other proceeding in law or in equity is brought to enforce the covenants contained in (a) or (b) above or to obtain money damages for the breach thereof, and such action results in the award of a judgment for money damages or in the granting of any injunction in favor of the non-breaching party all expenses (including reasonable attorneys' fees) of the non-breaching party in such action, suit or other proceeding shall be paid by the breaching party.

10.    **Representations and Indemnification**.
(a)    SJA acknowledges that Weiss' services are of the essence to this Agreement and agrees that it will not be entitled to provide the services of any other person in her stead in performance of SJA's obligations hereunder.

(b)    SJA and Weiss represent and warrant, jointly and severally, to the Company that (i) there are no written or oral agreements with any person, firm, corporation or other entity or restrictive covenants which would prevent or impair SJA or Weiss from providing services to the Company, entering into and performing this or any other agreement with the Company or in any way rendering services for the Company, or placing advertising on behalf of accounts through the Company and (ii) SJA has the authority to cause Weiss to perform the services contracted for by the Company hereunder and is duly authorized and empowered to enter into, and perform its obligations and grant all rights granted under, this Agreement. SJA and Weiss, jointly and severally, agree to and shall defend, indemnify and hold harmless the Company, and its officers, directors and stockholders from any claim, suit liability or judgment that may be asserted, assessed or entered, including attorneys' fees and all other costs of defending same, as a result of a breach of any of the foregoing representations and warranties.

(c)    SJA acknowledges and agrees that it is an independent contractor, and shall have no authority whatsoever to bind the Company by contract or otherwise. SJA further acknowledges and agrees that the compensation payable to SJA hereunder shall be in full consideration for the services to be provided by it and by Weiss hereunder, and that it shall be the obligation of SJA to pay all applicable taxes, and make all applicable withholdings and payments in respect of its employment of Weiss. SJA and Weiss, jointly and severally agree to defend, indemnify and hold harmless the Company, and its officers, directors and stockholders, to the extent of any obligations

imposed by law on the Company to pay any withholding taxes, social security, unemployment or disability insurance or similar items in connection with any payments made to SJA by the Company pursuant to this Agreement on account of SJA or Weiss.

(d)    If any action shall be brought or asserted against any person entitled to be indemnified under subparagraph (b), the indemnified person shall promptly notify SJA. SJA shall assume the defense of the action, including the employment of counsel approved by the indemnified person (whose approval shall not be unreasonably withheld) and payment of all expenses. The indemnified person shall have the right to employ separate counsel in the action and to participate in the action, but the fees and expenses of that counsel shall be paid for by the indemnified person. The indemnified party shall not be liable for any settlement of any action effected without its/his consent, which consent shall not be unreasonably withheld.

(e)    If any action shall be brought or asserted against any person entitled to be indemnified under subparagraph (c), the indemnified person shall promptly notify SJA. The Company shall assume the defense of the action, including the employment of counsel and payment of all expenses. SJA shall have the right to employ separate counsel in the action and to participate in the action, but the fees and expenses of such counsel shall be paid for by SJA. Notwithstanding anything to the contrary contained in this paragraph 10, the aggregate indemnity-related liability of SJA and/or Weiss (including attorney's fees and other costs of defending any action) for any action brought with respect to subparagraph (c), shall not exceed the aggregate compensation paid to SJA under this Agreement, plus interest and penalties assessed or assessable in connection with the claim which is the subject of the action.

11.    **Clients.**

Simultaneously with the execution of this Agreement, SJA is delivering to the Company a list of clients and accounts which it intends to engage on behalf of the Unit and a statement of the gross revenues from each such client for the twelve-month period ending December 31, 1989. None of such clients has advised SJA or Weiss, orally or in writing, formally or informally, that it is terminating or considering termination or is materially dissatisfied with the handling of its business by SJA or Weiss, as a whole, in substantial part, or in respect of any particular product or service.

12.    **Choice of Vendors.**

Notwithstanding anything contained in this Agreement to the contrary, Weiss shall have discretion, with the approval of the Company, in the choice of vendors for production materials and services ordered by the Unit on behalf of or for the benefit of clients of the Unit.

13.    **Retirement.**

(a)    If Weiss decides to retire from the Company, and at any time within one year following the termination of Weiss' engagement by the Company, SJA or Weiss (the "Offering Party"), directly or indirectly, elects to sell any interest which either may have retained in the clients, accounts or goodwill associated with the business of the Unit (the "Business"), the Offering Party shall obtain an irrevocable and unconditional

bona fide arm's length written offer (hereinafter called the "Bona Fide Offer") for the purchase of the Business from a third party(ies) (hereinafter called the "Outside Party"). The Offering Party shall give a written notice (hereinafter called the "Option Notice") to the Company setting forth such desire, which notice shall be accompanied by a photocopy of the original executed Bona Fide Offer and shall set forth the name and address of the Outside Party and the price and terms of such offer. The Company shall then have a first option to purchase the Business specified in the Option Notice at a price equal to the price proposed to be paid for the Business as specified in the Bona Fide Offer; said option to be exercisable by the Company giving notice of such election to the Offering Party within thirty (30) days after the giving of the Option Notice.

(b)     If the Company shall not have elected to purchase all of the business offered in the Option Notice, then the Company cannot purchase any of the Business and the Offering Party shall be free to transfer the Business to the Outside Party at a price and terms as contained in the Bona Fide Offer.

**14.    Enforceability.**
The failure of either party at any time to require performance by the other party of any provision hereunder shall in no way affect the right of that party thereafter to enforce the same, nor shall it affect any other party's right to enforce the same, or to enforce any of the other provisions in this Agreement; nor shall the waiver by either party of the breach of any provision hereof be taken or held to be a waiver of any subsequent breach of such provision or as a waiver of the provision itself.

**15.    Assignment.**
This Agreement, and SJA's rights and obligations hereunder, may not be assigned by SJA or Weiss.  The Company may assign its rights, together with its obligations hereunder, in connection with any sale, transfer or other disposition of all or substantially all of its business and assets or the business and assets of the Unit, and such assignee shall assume all of the obligations and liabilities of the Company hereunder, or, alternatively, the Company shall make reasonable accommodation for the fulfillment or discharge thereof.

**16.    Modification.**
This Agreement may not be orally cancelled, changed, modified or amended, and no cancellation, change, modification or amendment shall be effective or binding, unless in writing and signed by the parties to this Agreement.

**17.    Severability; Survival.**
In the event any provision of this Agreement is found to be void and unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall nevertheless be binding upon the parties with the same effect as though the void or unenforceable part had been severed and deleted.  The provisions of paragraph 9 hereof shall survive the termination of this Agreement.

-10-

18. **Life Insurance.**

SJA agrees that the Company or one of its affiliated companies shall have the right to obtain life insurance on Weiss' life, at such company's sole expense and with the Company or such affiliate as the sole beneficiary thereof. Weiss shall cooperate fully in obtaining such life insurance.

19. **Notice.**

Any notice, request, instruction or other document to be given hereunder by either party hereto to the other shall be in writing, and delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, to the address set forth for such party at the head of this Agreement. Any notice so given shall be deemed received when personally delivered or three days after mailing. Any party may change the address to which notices are to be sent by giving notice of such change of address to the other parties in the manner herein provided for giving notice.

20. **Applicable Law.**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York, applicable to agreements made and to be performed entirely within New York.

21. **Arbitration.**

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in New York, New York in accordance with the commercial arbitration rules of the American Arbitration Association. Any arbitration under this Agreement shall be conducted in New York, New York, before a panel of three arbitrators, each of whom shall be an attorney-at-law admitted to practice in New York. The American Arbitration Association shall appoint the arbitrators to constitute the panel of such arbitrators, and the appointment by the American Arbitration Association shall be final and binding. Judgment upon the award rendered in the arbitration may be entered in any court having jurisdiction.

22. **Entire Agreement.**

This Agreement represents the entire agreement between the Company and SJA with respect to the subject matter hereof, and any prior agreements relating to the

-11-

engagement of Weiss' services by the Company written or oral, are nullified and superseded hereby.

        **IN WITNESS WHEREOF,** the parties have set their hands and seals on this 20th day of April, 1990.

**BERNARD HODES ADVERTISING, INC.**

By_____

              Title

**S.J.A. INC.**

By:_____

              Title

In order to induce the Company to enter into the foregoing agreement with SJA Inc., and for other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned hereby represents and warrants that the undersigned is familiar with each term and condition of the foregoing agreement, and the undersigned hereby consents and agrees to the execution and delivery of said agreement by SJA Inc. and hereby agrees to render all of the services therein provided to be rendered by the undersigned, grants to the Company all of the rights granted therein on her behalf, and agrees to be bound by and duly perform and observe each and all of the terms and conditions of said agreement requiring performance or compliance on the part of the undersigned, including, without limitation, the provisions regarding indemnification by the undersigned provided in Paragraph 10 thereof, and hereby joins in all warranties, representations, agreements and undertakings made by SJA Inc.

April 20, 1990.

_____
Sherry Weiss

-13-

## UNIT GROSS REVENUES

"Unit Gross Revenues" shall mean the sum of the following paragraphs (1) and (2):

(1)    Actual sums billed to clients of the Unit for advertisements placed on behalf of, or at the order of, such clients. Advertisements shall include solicitations in any and all media, including but not limited to print (e.g., newspapers and magazines), broadcast (e.g., radio and television), direct mail, outdoor or billboard advertising, whether local, national, foreign or international. Actual sums billed shall include ancillary charges billed to such clients and related to the placement and/or responses to such advertisements, including but not limited to the items identified in the following clauses (a), (b), (c) and (d) hereof, but in the case of such items, the amount to be included in Unit Gross Profits shall be the actual amounts billed for: (a) messenger and courier services, (b) fax or telecopier charges, (c) telecommunications costs, and (d) charges for box reply and forwarding of responses thereto, less the Company's estimated costs thereof. Notwithstanding the foregoing, sales taxes now or hereafter imposed, the billing and collection of which is imposed upon the Unit and required by federal, state or local authorities having jurisdiction thereof shall not be considered a part of Unit Gross Revenues. The parties agree to review the billing of the charges specified in clauses (a)-(d) (including adjustments to the method of billing such charges) after the first three months of the Term.

- and -

(2)    Actual sums billed to clients of the Unit for the copywriting, production, creation, distribution of advertising material, brochures, promotional material, direct response material, reports related thereto, whether or not the transfer of tangible property is a part thereof. Included in this category are charges to clients of the Unit for "art borders", proofs or conceptual transmissions (whether used or not by such clients), publicity charges or expenses billed for photography, speaking engagements, convention arrangements, booth design and production, travel and/or other out-of-pocket expenses which may be billed in connection therewith. Also included are all charges for consulting, media research, planning or similar services actually billed to clients of the Unit.

It is the intent of this definition that all billings to clients of the Unit be included as part of Unit Gross Revenues, whether listed herein or not, with the sole exception of sales and similar consumption-based taxes described in the last sentence of paragraph (1) of this Exhibit A less discounts, credits and allowances to clients of the Unit; provided, however, that no such discounts and allowances may be issued or granted without the mutual agreement of the Company and the Employee. No discounts, credits or allowances issued or granted to clients of the Unit shall be deducted from the foregoing in the computation or the determination of Unit Gross Revenues unless approved in writing by Employee.

## UNIT OPERATING EXPENSES

Unit Operating Expenses shall mean the sum of the following items (i)-(ix) of costs and expenses:

(i)      amounts actually paid for media placed on behalf or at the order of clients of the Unit. (The parties agree that it is impractical to determine this amount directly, and have therefore agreed to determine this amount on a monthly basis by assuming that it equals 82% of the amounts actually billed to clients for media placed on their behalf or at their order.  The Company shall add 0.5% to the assumed media expense rate in calculating Unit Operating Profits. For each month of the Term of this Agreement, the Company shall (approximately 180 days after the close of such month) determine the actual amounts paid for media for that month as known at such calculation date, and make an appropriate adjustment to the Unit Operating Profits for such month.  The Company shall be entitled to add 0.5% to the adjusted assumed media expense rate used to calculate Unit Operating Profits.The assumed media expense (82%) may be adjusted by the parties following the expiration of the first 12 months of the Term if the assumed media expense rate does not reflect actual media expenses paid.

(ii)      the actual costs incurred and paid or payable by the Company for production materials and services ordered by the Unit on behalf or for the benefit of clients of the Unit, irrespective of the amounts actually billed to clients of the Unit for such materials and services, net of all commissions, allowances, rebates allowed or to be allowed to the Company by the vendors thereof, including as a cost sales and/or use taxes required to be paid by the Company on the purchase of such production materials and services;

(iii)      the actual costs of compensation, including taxes, fringe benefits, and all other related payments to or for the benefit of employees whose time is devoted primarily (or partially as SJA may agree) to the Unit, and who report directly or indirectly to Weiss in her capacity as Senior Vice President of the Company;

(iv)      the actual costs to the Company of amounts determined by the mutual agreement of the Company and Weiss to represent uncollectible accounts receivable of the Unit, less any recoveries by the Company of amounts previously determined to have been uncollectible.  The determination of whether or not an account is uncollectible shall be made upon mutual agreement of the Company and Weiss, provided that an account which remains uncollectible for a period of six months will be deemed to be uncollectible, and will be written off by the Company;

(v)      ordinary, necessary and reasonable business-related travel and entertainment expenses of the Employee or employees of the Unit whose time is

devoted exclusively to the Unit and who report directly or indirectly to the Employee in her capacity as Senior Vice President of the Company, not to exceed the sum of $36,000 per annum, unless such greater sum, if any, is expressly approved in writing by the duly authorized senior officer of the Company (any amounts in excess of $36,000 per annum not so approved shall be considered as an expenditure chargeable to the employee as additional compensation and deducted against amounts otherwise payable);

(vi)     a sum computed at the rate of 1.5% per month on all accounts receivable of the Unit outstanding more than ninety (90) days from the actual date of billing of such receivables, reduced by any payments made on account of such accounts receivable. Notwithstanding the foregoing, the total sum that may be computed with respect to any individual account receivable shall not exceed 12% of such individual account receivable outstanding more than ninety (90) days. It is understood that the Company may write off any such receivable after the same shall have remained outstanding for a period of one year;

(vii)     the greater of (a) $300,000 or (b) a sum computed at the rate of 3% per annum of the Unit Gross Revenues, as hereinbefore defined, which sum is in lieu of any cost or charge which may be paid or incurred by the Company or the Unit for expenses to be incurred by it to provide the Unit with "back office services," including, but not limited to, rents, related occupancy costs such as heat, light, power, cleaning, and occupancy taxes, checking, mailroom, messenger, reception and similar general office services, billing, internal credit and collection services, vendor invoice processing and accounts payable services, payroll services, including the preparation of all taxes and reports related thereto, personnel and benefit program administration, general accounting, professional fees except those specifically ordered by the Unit, all postage, forms, office stationery and supplies ordinary and necessary for the operation of the Unit, office furnishings and equipment, including personal computers and related peripheral equipment essential to the prompt and efficient placement of advertising by the Unit, and any related maintenance, artist supplies and equipment, including such computer equipment necessary for the modern, timely production of advertising copy as set forth on Exhibit B and materials related thereto, depreciation or amortization thereof, telephone, facsimile transmission or other telecommunications equipment, services and maintenance thereof, any and all income and/or franchise taxes levied on Unit profits, revenues or otherwise, penalties or interest thereon, and interest expense;

(viii)   Production and/or Art Support and/or research provided to the Unit by the Company to be charged at the Company's internal rates; and

(ix)     If the Unit exceeds the credit approval levels set by the Company credit department, any resultant write-offs shall be charged on a dollar-for dollar basis to Weiss as additional compensation and deducted from amounts otherwise payable.

<u>Exhibit C</u>

## SPACE, FACILITIES, EQUIPMENT
## AND BACK OFFICE SUPPORT

### <u>Space and Facilities</u>

Up to 6,000 square feet as needed on the second floor of 555 Madison Avenue. Additional space to be obtained as business conditions dictate. Space (including any additional space) to be furnished by the Company with all office furniture necessary to fulfill the business objectives of the Unit and provided with all services required by the Unit, including, but not limited to, cleaning and security services, heat, light, HVAC, etc. The space shall be accessible 24 hours per day, 7 days per week.

### <u>Equipment</u>

All equipment necessary to fully support the Unit, including, but not limited to:

1     telephone system consisting of 20 lines and 15 instruments

4     telecopiers (high-speed commercial grade)

10     PC type work stations with hard-disk storage

2     laser printers

8     letter-quality character printers

2     high-speed copiers

2     dedicated "Macintosh" type large screen artist work stations, including drafting tables and all pertinent supplies necessary for art production, with software and data storage capability as is customarily required for the efficient production of camera-ready artwork; "stat" production facility and additional typesetting capabilities

-     telecopiers to be installed at offices of clients of the Unit having annual gross billings greater than $100,000

7     stations for "on line" telecommunications with <u>The New York Times</u> and other newspapers as reasonably required to service the business needs of the Unit

In addition to the foregoing, the Company shall allow the Unit to use the Company's furniture and equipment as may be required from time to time to meet

deadlines of the Unit, on the same basis and with the same priority as other divisions of the Company.

<u>Back Office Services</u>

All back office services necessary to fully support the Unit, including but not limited to:

- timely billing of all clients of the Unit, subject to the review and approval of Weiss

- credit support (approval)

- collection services of all accounts receivable owing from clients of the Unit

- Unit payroll administration, including preparation and payment, benefits, insurance and related administration

- mail-room services

- switchboard services

- payment and accounting services for all accounts payable relative to the operations of the Unit, after review and approval Weiss

- preparation of monthly profit and loss statements pertaining to the Unit on a monthly and year-to-date basis

- EDP support -- as agreed

- repair, installation and troubleshooting for all equipment

- petty cashier services

- contract administration assistance

- checking services

EXECUTION COPY

AMENDMENT TO
CONSULTING AGREEMENT

AMENDMENT TO CONSULTING AGREEMENT, dated and effective as of January 1, 2003, by and between BERNARD HODES ADVERTISING, INC. (the "Company") and S. J. ASSOCIATES, INC. ("SJA").

## RECITALS

A.  The Company and SJA have entered into a Consulting Agreement dated as of April 20, 1990 (the "Consulting Agreement").

B.  The Company and SJA desire to amend the Consulting Agreement to reflect certain modifications to the Consulting Agreement and certain additional agreements of the parties relating to the Consulting Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## AGREEMENT

Section 1.    Amendments.

(a)    Paragraph 5 of the Consulting Agreement (Expenses):  The seventh line of Paragraph 5 is hereby amended by deleting the amount  "$36,000" and inserting the phrase "0.3% multiplied by Unit Gross Revenues".

(b)    Paragraph 8 of the Consulting Agreement (Unit Operating Profit Targets): Paragraph 8 (b) is hereby amended by deleting the such paragraph in its entirety and replacing it by:

"(b)  Thereafter, as of the end of every calendar month during the Term, the average monthly Unit Operating Profits of the Unit for the preceding 12-month period is expected to equal or exceed $60,000."

(c)    Exhibit A of the Consulting Agreement (Unit Gross Revenues):

(i)    The first line of the definition of Unit Gross Revenues is hereby amended by deleting such line in its entirety and replacing it by:  " 'Unit Gross Revenues' shall mean the sum of the following paragraphs (1), (2) and (3):"

(ii)    A new paragraph (3) is hereby added immediately after paragraph (2) of the definition of Unit Gross Revenues, which new paragraph states as follows:

NY183932.4/156-09614

"and; (3) The Relevant Percentage (as defined below) multiplied by the gross revenues received by the Company from any New Recruitment Advertising Business (as defined below) in each of the two 12 month periods immediately following receipt of the first payment received by the Company in respect of any such New Recruitment Advertising Business. As used in this Agreement, the term "Relevant Percentage" shall mean 2% for the first 12 month period following receipt of the first payment received in respect of any New Recruitment Advertising Business, and 1% for the second 12 month period following receipt of the first payment received in respect of any New Recruitment Advertising Business; and the term "New Recruitment Advertising Business" shall mean any traditional recruitment advertising business, account or client introduced or referred to the Company by an employee of the Unit from and after January 1, 2003 and serviced or handled by the Company but not by SJA. For the avoidance of doubt, (i) disputes regarding whether any traditional recruitment advertising business, account or client was first introduced or referred to the Company by an employee of the Unit shall be determined reasonably and in good faith by the Chief Financial Officer of the Company and shall be binding upon SJA absent manifest error, (ii) the gross revenues derived from New Recruitment Advertising Business shall be calculated in the same manner as Unit Gross Revenues are calculated for the Unit, with the necessary changes being made to reflect the fact that gross revenues from New Recruitment Advertising Business are generated from clients outside of the Unit, (iii) notwithstanding anything to the contrary contained herein, the agreement between the Company and SJA with respect to New Recruitment Advertising Business shall apply to traditional recruitment business only, and shall not apply to revenues derived from any other type of business referred to the Company by SJA, or to the development of business concepts or ideas unrelated to traditional recruitment advertising by SJA and the Company, each of which, if pursued or developed by SJA and shared with the Company in the sole discretion of SJA, shall be negotiated on a case by case basis between the Company and SJA, and (iv) upon notice from SJA, the Company shall use good faith and commercially reasonable efforts to cause any branch of the Company proposing to contact, make a presentation or offer similar services to an existing client of the Unit to consult with the Unit to coordinate any such contact, presentation or offer."

(d)     Exhibit B of the Consulting Agreement (Unit Operating Expenses):

(i)     The first line of item (vi) of the definition of Unit Operating Expenses is hereby amended by deleting the amount "1.5%" and inserting the amount "1.0%".

(ii)     Item (vi) of the definition of Unit Operating expenses is hereby amended by deleting in its entirety the following text:

"Notwithstanding the foregoing, the total sum that may be computed with respect to any individual account receivable shall not exceed 12% of such individual account receivable outstanding more than ninety (90) days."

(iii)     The second line of item (vii) of the definition of Unit Operating Expenses is hereby amended by deleting the amount "3.0%" and inserting the amount "4.5%".

(iv)     A new item (viii) is hereby added immediately after item (vii), which new item states as follows:

"(viii) an additional supplemental fee of $16,000 per month;"

(v)     existing item (viii) is hereby renumbered item "(ix)"

(vi)     existing item (ix) is hereby renumbered item "(x)"

Section 2.     No other Changes.  Except as expressly set forth is this Amendment to Consulting Agreement, the Consulting Agreement shall remain unchanged.

Section 3.     Counterpart Execution.  This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but all of which together shall constitute one agreement binding all of the parties hereto.

Section 4.     Governing Law.  This Agreement shall be construed and the obligations of the parties hereunder shall be determined in accordance with the laws of the State of New York (without regard to any conflict of laws provisions thereof) and applicable federal law.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Amendment as of the date first above written.

BERNARD HODES ADVERTISING, INC.

By: _Joseph Fortunato_____
Name: JOSEPH FORTUNATO
Title: EVP CFO
Dated: 2/13/03

S.J. ASSOCIATES, INC.

By: _Sherry Jacobson_____
Name: Sherry Jacobson
Title: President
Dated: 2·13·03

Exhibit 2

# BERNARD HODES GROUP

July 11, 2008

Ms. Sherry Jacobson
S.J.A. Inc.

Re:    **Termination of Consulting Agreement**

Dear Sherry:

This letter will serve as notice of the Company's intention to terminate the S.J.A. Consulting Agreement and your services effective January 7, 2009. Your latest rejection of our proposals for the restructuring of the Unit and the potential loss of significant client accounts in light of Andy's anticipated departure, compels us to take this step in the hope of retaining important segments of our business and client relationships.

As you know, your Consulting Agreement provides that it may be terminated by either of us on not less than 180 days notice. We would, of course, be open to discussing a foreshortening of that period if it suits your purposes. In the meantime, we instruct you not to come into the office or to conduct Unit business until further notice.

We take this occasion to remind you that until the effective date of the termination of your consultancy, you remain an executive of the Company. We will expect you to abide by all restrictions and covenants imposed upon you under the Consulting Agreement or by reason of your position, including those prohibiting attempts to hire Company employees, the solicitation and/or servicing of its clients, and any other activity having the foreseeable effect of injuring this Company's reputation, business or business relationships.

Please feel free to contact me or Alan with any questions you may have concerning the above. If you intend to have Jon Kibbe or Craig Newman involved, they should be in touch with David Lehv.

Yours,

Joe Fortunato
Joe Fortunato
Chief Operating &
Financial Officer
Bernard Hodes Group, Inc.

220 East 42nd Street
New York, NY 10017
T 212.999.9000  F 212.999.9920
www.hodes.com

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------x
SHERRY JACOBSON ASSOCIATES INC.,                   :
                                                                          :     Index No. 650272/2008
                                        Plaintiff,               :
                                                                          :
                                                                          :     **PLAINTIFF'S NOTICE OF**
        -against-                                                 :     **DISCOVERY AND**
                                                                          :     **INSPECTION TO**
                                                                          :     **DEFENDANT ANDREW**
ANDREW KATZ,                                                  :     **KATZ**
                                                                          :
                                        Defendant.              :
                                                                          :
                                                                          :
                                                                          :
                                                                          :
                                                                          :
-------------------------------------------------------------x

        PLEASE TAKE NOTICE that, pursuant to Sections 3101 and 3120 of the New York

Civil Practice Law and Rules ("CPLR"), Plaintiff Sherry Jacobson Associates Inc., hereby

demands that Defendant Andrew Katz produce all of the below requested documents in his

possession, custody or control for inspection and copying by counsel for Sherry Jacobson

Associates Inc. at their offices at 488 Madison Avenue, 11th Floor, New York, New York 10022,

on or before September 3, 2008.

                                        <u>DEFINITIONS</u>

        "SJA" refers to and includes Plaintiff Sherry Jacobson Associates Inc. and any successor

or predecessor in interest, related or affiliated partnerships, corporations, businesses, entities or

divisions thereof, wherever located, and their past and present officers, employees, agents,

attorneys, or other persons or entities acting or purporting to act on SJA's behalf.

"Sherry Jacobson" refers to and includes Ms. Sherry Jacobson, the principal of SJA including her past and present employees, agents, attorneys, or other persons or entities acting or purporting to act on Ms. Jacobson's behalf.

"Plaintiff" refers to and includes SJA.

"Katz," "You," "Your" or "Defendant" refers to and includes Andrew Katz, and any entity affiliated with Katz and any agents, attorneys, or other persons or entities acting or purporting to act on his behalf.

"Hodes" refers to and includes the Bernard Hodes Group Inc., and any entity affiliated with Hodes and any agents, attorneys, or other persons or entities acting or purporting to act on its behalf.

"Fortunato" refers to and includes Joe Fortunato, the Chief Operating Officer and Chief Financial Officer of Hodes, and any entity affiliated with Fortunato and any agents, attorneys, or other persons or entities acting or purporting to act on his behalf.

"Schwartz" refers to and includes Alan Schwartz, the Chief Executive Officer of Hodes, and any entity affiliated with Schwartz and any agents, attorneys, or other persons or entities acting or purporting to act on his behalf.

"Omnicom" shall mean Omnicom Group Inc. and all its members, managers, subsidiaries, or present or former officers, directors, employees, agents, attorneys, or other representative of any of them and all other persons acting or purporting to act on behalf of them.

"SJ Unit" shall mean the operating unit within Hodes operating at 220 East 42nd Street, New York, New York, operated and managed by Sherry Jacobson.

"Consulting Agreement" shall mean the agreement between SJA and Hodes dated April 20, 1990, as amended February 13, 2003.

"Client" shall mean any individual or entity that has engaged Hodes and/or the SJ Unit to provide services, or any individual or entity that was solicited by Hodes and/or the SJ Unit or to which Hodes and/or the SJ Unit gave a presentation with respect to the services provided by the SJ Unit.

"Pornographic materials" shall mean materials, either in visual or written form, that are erotic and/or sexual in nature.

"Document" is used herein in its broadest sense and includes, without limitation, all writings, letters, e-mails, instant messages, memoranda, notes, instructions, reports, analyses, telephone memoranda, memoranda of conversations, telegrams, telexes, diaries, minutes, calendars, studies, logs, accounting reports, ledgers, journals, books, notebooks, plans, records, forms, charts, graphs, maps, recordings, motion pictures, slides, photographs (positive prints and negatives), worksheets, estimating sheets, computation sheets, computer printouts and programs, and all other things of like nature, including drafts or non-identical reproductions, in any form, of the foregoing items. "Document" also includes and refers to information recorded and/or stored on tape, disc, record or by electronic or other means, as well as information stored on computer systems, Blackberry or similar devices, computer storage systems, CD-ROM, floppy diskettes, computer tape back-ups, microfilms, microfiche and the like. Any document containing written or other interlineations in addition to that contained on another document must be produced in addition to that other document. "Document" also includes and refers to the files or any containers holding or which once held any documents, as well as to any writings or printings which may appear on such files or containers. "Document" also includes all documents annexed to the responsive document. "Document" also includes drafts and all annotated copies.

"Communication" shall mean any contact or transfer of information between two or more persons, entities, partners, venturers, companies, subsidiaries, or affiliates, including any of the directors, officers, employees, agents or representatives thereof, and shall include, without limitation, written contact by such means as letters, memoranda, telegrams, telexes, electronic mail or any other documents; oral contact by such means as face-to-face meetings and telephone conversations; and electronically or magnetically transferred or stored information that is or has been transmitted between any two persons or companies, including but not limited to, voice mail. Correspondence shall mean email correspondence to or from any and all email addresses, including personal email addresses maintained by Katz as well as email messages sent or received by Katz through email addresses maintained by other individuals.

The term "relating to" (or any conjugation thereof) is to be given its ordinary meaning and should be given the broadest possible scope consistent with the discovery rules contained in the CPLR, and include without limitation: constituting, concerning, considering, underlying, modifying, amending, confirming, endorsing, representing, regarding, comprising, containing, setting forth, showing, supporting, disclosing, describing, terminating, revoking, negating, explaining, summarizing, or mentioning, directly or indirectly, in whole or in part. This term should be construed to apply not only to the events to which it refers directly, but also to all meetings, discussions, contacts, and other communications concerning those events between or among any of the parties described or any other persons.

In interpreting these requests, the singular form of a word shall be considered to include within its meaning the plural form of the word so used, and vice versa; the masculine form of a word shall be considered to include within its meaning the feminine and neuter forms so used, and vice versa; the use of any tense of any verb shall be considered to include within its meaning

all other tenses of the verb so used; whenever the term "all" is used herein, it shall also be construed to mean "any" and "each" and vice versa; and the use of "and" shall be considered to include "or" and vice versa, in each instance so that these requests are more rather than less inclusive.

## INSTRUCTIONS

Each response to a Request should be preceded by an identification and verbatim quotation of the Request to which the response applies. A separate response should be given to each Request. In the event that documents sought in one Request will be furnished by reference to another Request, appropriate cross-reference should be made.

The documents produced should be organized so as to correspond to the numbered paragraphs of specific requests for production of documents.

Katz is requested to produce all documents in his possession, custody or control or in the possession, custody or control of his attorneys, directors, trustees, officers, principals, partners, owners, employees, agents or representatives or in the possession of any corporation or entity owned or controlled by Katz. Without limitation this includes all documents that his attorneys, directors, trustees, officers, principals, partners, owners, employees, agents or representatives maintain at their homes or in any other property to which they have access.

All documents produced by Katz shall be produced as they are maintained in the usual course of business or shall be organized and designated so as to correspond to each numbered request. Documents stapled, clipped, bound or otherwise attached to each other should not be separated. Documents contained, maintained, or stored in file folders or any other fastener should be produced in such a manner as to identify the label on such file folder or fastener.

The foregoing requests shall be deemed to be continuing so as to require further and supplemental production by Katz of all responsive documents at any time prior to the conclusion

of this litigation. Katz is required to serve promptly any information requested herein that is unavailable at the time answers hereto are submitted, but that becomes available to him or that changes, amplifies, or affects the correctness of any such answers.

If any document requested is withheld on the basis of the assertion of privilege, Katz is required to provide a list which describes the privilege asserted and enumerates the document's date, the type of documents, author, addressee, the identity of all persons to whom the documents were sent and subject matter, where not apparent, the relationship of the authored and addressee(s) to each other, the paragraph of this Request to which the document is responsive, and such other information as is necessary in order to determine the bona fides of the claim of privilege. This list shall be served upon the undersigned at the time of the production in response to these requests.

If any document requested has been lost, destroyed, or transferred (voluntarily or involuntarily), Katz is required to provide a list of each document so lost or destroyed which identifies the document's date, author, addressee, recipient, subject matter, the date upon which the document was lost or destroyed, the reason why it was destroyed and/or to whom it was transferred. This list shall be served upon the undersigned at the time of the production in response to these requests.

Katz is to furnish all information which is available to him as of the date of the production of responsive documents. If Katz is unable to provide a response to any of the requests, Katz must specify the extent of his knowledge and inability to answer the remainder, setting forth the efforts made to obtain the requested information.

Produce all electronic data responsive to the following requests, translated, if necessary, into reasonably usable form. For all data compilations responsive to this request, produce an

exact duplicate of such data on a computer disk that can be read by a common spreadsheet program (such as Lotus 1-2-3 or Microsoft Excel), as well as a hard-copy version of such data. In addition, provide a detailed description of how the data is stored, including the format in which it was saved, the name of each field, and the number of records.

If Katz objects to any particular portion of any document request, he is required to produce documents in response to any other portion of such document request as to which there is no objection. Pursuant to CPLR 3122, if one or more documents responsive to a specific request are being withheld from production, Katz is required to give notice of that fact, and must indicate the legal ground for withholding each such document. With respect to each such document withheld, Katz shall identify: (a) the type of document; (b) the general subject matter of the document; (c) the date of the document; and (d) such other information as is sufficient to identify the document for a subpoena duces tecum.

The document requests set forth below apply to the period from June 1, 2001 to the present unless stated otherwise in any particular request (the "Relevant Period").

<u>DOCUMENT REQUESTS</u>

1. Produce all documents and communications relating to Your employment by Hodes.

2. Produce all documents and communications relating to Your assignment to the SJ Unit.

3. Produce all documents and communications relating to SJA, including, but not limited to, communications with any Client, Fortunato or Schwartz relating to SJA.

4. Produce all documents and communications relating to Ms. Jacobson, including, but not limited to, communications with any Client, Fortunato or Schwartz relating to Ms. Jacobson.

5.    Produce all documents and communications relating to the termination and/or the intent to terminate the relationship between Hodes, on the one hand, and SJA and Ms. Jacobson, on the other hand.

6.    Produce all documents and communications relating to revenues or profits earned by the SJ Unit and/or Hodes, including, but not limited to, profit and loss statements and commission statements relating to the SJ Unit, as well as documents and communications relating to revenues or profits earned by the SJ Unit submitted to Hodes.

7.    Produce all correspondence (including without limitation all communications and documents) regarding your employment with Hodes and/or assignment to the SJ Unit, including, but not limited to, correspondence with Fortunato and/or Schwartz, as well as documents and communications relating to revenues or profits earned by the SJ Unit submitted to Hodes.

8.    Produce all correspondence between You and SJA or Jacobson relating to Schwartz and/or Fortunato.

9.    Produce all correspondence (including without limitation all communications and documents) regarding potential business opportunities and relationships between You and the SJ Unit, including, but not limited to, correspondence with Fortunato and/or Schwartz.

10.    Produce all correspondence (including without limitation all communications and documents) regarding potential business opportunities and relationships between You and Hodes.

11.    Produce all documents and communications relating to ownership in the SJ Unit, including but not limited to proposed ownership in the SJ Unit.

12.    Produce all documents relating to potential business or employment opportunities offered to, considered or solicited by You.

13.    Produce all documents relating to potential business opportunities for the SJ Unit.

14.    Produce all correspondence between you and Fortunato regarding the SJ Unit, Hodes, SJA and/or Jacobson.

15.    Produce all correspondence between you and Schwartz regarding the SJ Unit, Hodes, SJA and/or Jacobson.

16.    Produce all documents relating to Your compensation by Hodes, SJA and/or the SJ Unit, including but not limited to proposals relating to Your compensation.

17.    Produce all calendars and diaries containing business entries, including but not limited to electronic calendars and diaries.

18.    Produce all credit or charge card receipts relating to meal, travel and/or client-related entertainment expenses incurred in connection with your employment by the SJ Unit and/or Hodes.

19.    Produce all credit card, charge card or bank account statements relating to meal, travel and/or client-related entertainment expenses incurred in connection with your employment by the SJ Unit and/or Hodes.

20.    Produce all telephone or Blackberry account statements for which You sought reimbursement from the SJ Unit and/or Hodes..

21.    Produce all documents relating to expense reimbursement requests submitted to the SJ Unit or Hodes.

22.    Produce all documents, communication and correspondence relating to pornographic materials, including but not limited to evidence that pornographic websites were accessed from your home, laptop and/or work computers and pornographic materials and/or links to pornographic websites that were sent to Hodes and/or SJ Unit employees, including but not

limited to Schwartz and/or Fortunato.

23.    Produce all computers, including lap top and desk top computers, from which SJ Unit or Hodes business was conducted, including those at Your home address.

24.    Produce all personal digital assistant devices from which SJ Unit or Hodes business was conducted.

25.    Produce all documents relating to Your trip to Sioux Falls, South Dakota in June 2008.

26.    Produce all documents relating to Your attendance at Omnicom University, including but not limited to drafts and final versions of Your biography and correspondence regarding Omnicom University and/or Your biography.

27.    Produce all income tax returns, Internal Revenue Service Form 1099s and/or Internal Revenue Service Form W-2s.

28.    All documents that You intend to introduce as an exhibit at the trial in this action.

29.    All documents concerning Your defenses in this action.

30.    All documents concerning SJA's claims in this action.

31.    All documents sufficient to identify all e-mail accounts to which you have access.

Dated: New York, New York
      August 12, 2008

BERKE-WEISS & PECHMAN LLP

By:

Laurie Berke-Weiss
488 Madison Avenue, 11th Floor
New York, New York 10022
(212) 583-9500

RICHARDS KIBBE & ORBE LLP

By:

Craig A. Newman
Patricia C. O'Prey
One World Financial Center
New York, New York 10281
(212) 530-1800

Attorneys for Plaintiff Sherry Jacobson Associates
Inc.